MOHCCJRL, P.
This is an action of as-sumpsit brought by the defendants in error, Weeden, Johnson & Co., merchants of Baltimore, against the plaintiffs in error, S. M. & M. Rosenbaum, merchants of Richmond, to recover damages alleged to have been sustained by the former in consequence of the refusal and failure of the latter to accept and receive certain goods bargained and sold, and, according to the contract of sale, tendered to them by the former. The declaration contains three special counts, and also a general count on an account stated. There was a demurrer to the declaration and each count of it, which was afterwards withdrawn, and the general issue was joined and tried, on which a verdict and judgment were rendered in *788 favor of the plaintiffs in the court below for $1,360.89, with interest thereon from the 18th day of April, 1866, till paid. On the trial of the cause, the defendants in the court below moved the court to give three instructions to the jury; the first of which was accordingly given, but the second and third were refused; and a bill of exceptions was taken to the opinion of the court refusing them. The only questions we have to decide in this case are, Whether the court erred in refusing to give the second and third instructions aforesaid respectively?
*T'ne evidence introduced on the trial is set out in the bill of exceptions, and tended to prove, in substance, that on the 15th of January, 1866, Mr. Crabbe, one of the firm of the vendors, who resided and did business in Baltimore as jobbers and wholesale dealers in dry goods, being on a trip to the South, called at the store of the vendees in Richmond, and contracted to sell them ten bales of cotton goods called “I/anarks,” an article well known to the trade, at a certain price, and to be of a certain width, if they could be procured in Baltimore. Mr. Crabbe immediately communicated the fact of the sale to his partners in Baltimore, who purchased the goods, and on the 17th of the same month shipped them to the vendees in Richmond, and sent them also a letter and an account, which are set out in the bill of exceptions. The goods arrived in Richmond on the 19th of the same month — January, 1866. On the next day, the 20th, the vendees wrote to the vendors in regard to the goods, which had been received by the former. The letter is not in the record, not having been offered in evidence on the trial; but it appears from the reply of the vendors to that letter, that the vendees objected to the goods on the ground that they were not the article they had contracted to purchase; that they had contracted to purchase cotton goods, called “Warrens,” whereas the goods sent were “JC/anarks.” The said reply of the vendors bears date on the 22d of the same month, and is in the record. In it the vendors say that Mr. Crabbe’s order was to send “I/anarks,” and that it would not do to substitute any other brand; that they could hardly think that Mr. C. intended to sell, or the vendees could have expected to buy, “Warrens” at the prices named; that Mr. C. was in North Carolina, and would be in Richmond in a few days, and they preferred waiting for him to see the vendees, as he was familiar with the terms of sale. On the 29th of the same month, the vendees again *wrote to the vendors; but the letter is not in the record. Its purport, however, appears from the reply to it which is in the record, and bears date on the next day, to wit, the 30th of January, 1866. In that reply the vendors say: “Yours of the 29th to hand, in which you say that Mr. Crabbe has not called to settle the matter of the I/anarks sheetings, and that you wish us to write you by return mail, whether you should ship them to us or store them at our expense. We beg to say, in reply, that Mr. Crabbe must decide whether or not you ordered the I/anarks. If you did order that make of goods, we shall not take them back to account. If he sold you Warrens, or any other make than I/anarks, we will cheerfully take them back. Mr. C. writes us that he will be in Richmond this week, and we must ask of you to await his decision in the matter.” A few days after the date of that reply, to wit, on the 3d of February, Mr. C. returned from North Carolina to Richmond, and had an interview with the vendees, the particulars of which are not stated, but the result was unsatisfactory; as it appears that shortly thereafter eight of the ten bales of the said goods were returned to the vendors; the other two (which, according to the evidence offered by the vendees, had been opened and found to be wet, and not of the description of goods contracted to be purchased by them,) having been retained and paid for by them, without prejudice to their defence in this suit. On the 10th of February, the vendors wrote to the vendees as follows: “The Powhatan Steamboat Company delivered to us to-day eight bales brown cotton, which we presume are from you. We received these goods under protest, and so notified the captain of the steamer that brought the goods. We hereby notify you that we received these goods under protest, and hold them subject to your order. We have paid the freight and charged to you. We hold your letter stating, as one of your excuses for returning *these goods, that tjhey were damaged. We do not see that those returned are damaged, and have once more to say to you, that Mr. Crabbe’s affidavit that you bought these goods warrants us in stating that we shall hold you to your contract.” The goods having, it seems, been contracted to be sold on a credit of thirty days, the vendors, on the ISth of February, 1866, drew on the vendees at sight for $2,706.88, the price of the eight bales returned, with expenses added, but the draft was protested for non-payment. In the latter part of the same month of February, one of the vendees met one of the vendors in New York, and promised to call at the store of the latter in Baltimore and settle the claim for the price of the cottons. On the Sth of April following, a written notice, signed by the vendors, was addressed to and served on the vendees, to the following effect: 11 We hereby give you notice, that whereas, there are eight bales of brown muslins now in our warehouse in this city (Baltimore) belonging to you, which you have been notified to remove upon payment of our claims against said goods, amounting to $2,749.75, as per our account rendered, and which you have failed to do; we shall, unless said claim is paid before the 16th day of this month, April, 1866, proceed to cause the said eight bales of muslins to be sold on that day, at public auction, at the auction house of Rex, *789 Higgins & Co., in this city, on your account and at your risk and charges, and shall look to you for any deficiency arising from said sale.” The goods were not sold on the day named in the notice, because it was not the regular sale day of the auction house, and it was thought better by the vendors, for all parties, to postpone the sale to the regular sale day, which was the 18th, on which day the goods were sold at auction fairly, and brought the net sum of $1,240.06, which, in the opinion of the witness, was as much as they would have brought on the 16th. The market for such goods had been continually *falling, from the day of the first sale in January, to the sale at auction on the 18th of April. No notice wras given to the vendees of the change of the day of sale from the 16th to the 18th, though the sale was advertised as to each day in the Baltimore Sun, by Rex, Higgins & Co., the auctioneers; but the names of the parties concerned were not mentioned in the advertisements, which described the goods, and stated that they would be sold for cash, on account of whom it might concern.
The 2d and 3d instructions, which were asked for by the vendees and refused by the court, are as follow's:
2d. If, from the evidence, the jury shall believe that notice was given by the plaintiffs to the defendants, that the goods would be sold on account of the defendants, on the 16th of the mouth, and they were not sold on that day, but without further notice to the defendants was sold on the 18th of the month, then the plaintiffs are not entitled to recover.
3d. If the plaintiffs delayed the resale of the goods for an unreasonable time, upon a falling market, and then sold them, they are not entitled to recover.
If a vendee of goods refuse to accept them when tendered according to the contract of sale, the vendor may elect to rescind the contract and keep or dispose of the goods for his own use, or to let it remain in full force and hold the vendee liable for the price of the goods and all damages arising from his breach of the contract. If he elect to let the contract remain in full force, he may either bring his action for the price of the goods when it is due and payable, or he may sell the goods, apply the net proceeds of sale to the credit of the vendee on account of the money due by hitn, and bring an action against him to recover the balance. That the vendor may resell the goods in such a case is now well settled, though his general right to do so was for a long time doubted. It has *been frequentlj' the case that a condition was annexed to a sale, that the goods should be resold at the risk of the purchaser if he failed to comply with the terms of sale. In every such case, of course, the right of resale, and the liability of the first purchaser to make good the loss, existed. In cases of contracts entered into by the East India Company at their sales, it is usual, we are told, to introduce an express clause authorizing a resale by the vendor in the event of the purchaser’s default, and charging him with the loss, if any, and the expenses; and it appears to have been the opinion of Lord Ellen-borough that the law did not impliedly confer this power of reselling. But it has since been established, that where the price is unpaid, such power exists, even in the absence of any express stipulation; and that the purchaser is responsible for any loss which may occur, although he did not consent to the resale. Chitty on Contracts 381, marg. See also the cases cited in note (2). The power, in the absence of contract, seems at first to have been placed upon the ground, that where the goods are perishable, the vendor is not bound to let them perish in his hands, and thus lose his security. But this ground verj' much restricted the rule, and it has since been made general. The case of Maclean v. Dunn, decided by the Court of Common Pleas in 1828, and reported in 4 Bing. 722, 15 Eng. C. L. R. 129, clearly recognized the general rule. “It is admitted,” said Best, C. J., in that case, “that perishable articles may be resold. It is difficult to say what may be esteemed perishable articles, and what not; but if articles are not perishable, price is, and may alter in a few days or a few hours. In that respect there is no difference between one commodity and another. It is a practice, therefore, founded on good sense, to make a resale of a disputed article, and to hold the original contractor responsible for the difference. The practice itself affords some evidence *of the law, and we ought not to oppose it, except on the authority of decided cases.” “It is most convenient that when a party refuses to take goods he has purchased, they should be resold, and that he should be liable to the loss, if any, upon the resale. The goods may become worse the longer they are kept; and, at all events, there is the risk of the price becoming lower. ’ ’ The course of the English decisions on this subject, with the exception of the more recent cases, may be seen by referring to Blackburn on the Contract of Sale, from p. 329, to the end, where these decisions, down to the period of the publication of that valuable work, are collected. The work may be found in McKinley & Bescure’s Baw Bibrary, vol. 10, for a reference to which I am indebted to my brother Joynes. The same doctrine is laid down in our own elementary works on the subject. Chancellor Kent thus states it: ‘ ‘If the buyer unreasonably refuses to accept of the article sold, the seller is not obliged to let it perish on his hands, and run the risk of the solvency of the buyer. The usage on the neglect or refusal of the buyer to come in a reasonable time after notice, and pay for and take the goods, is for the vendor to sell the same at auction, and to hold the buyer responsible for the deficiency in the amount of sales.” 2 Kent’s Com. 504, marg. Indeed, the doctrine seems to have been settled in this country at a much *790 earlier period than in England. In Sands, &c., v. Taylor, &c., 5 John. R. 395, decided by the Supreme Court of New York in 1810, which is our leading case on the subject, and has ever since been followed in our American courts, the doctrine was recognized in its fullest extent. It is not strange that the authority of that case should be so great, when it is sustained, not only by the reasons rendered by the court in deciding it, but. by the fact that Kent, Ch. J., and Spencer, Thompson, Yates and Van Ness, Judges, composed the court, and were unanimous in making the decision.
*If the vendor elect to sell the goods and hold the vendee liable for the loss, he ought, of course, to notify the vendee that such is his election, in order that the vendee may know what the consequence of his .continued default may be, and may, if he can and chooses to do so, avert it by performing his contract and receiving the goods; or at least may endeavor to mitigate his loss by paying some attention to the resale of the goods. Considering the contract of sale as still in force, the goods belong to the vendee, subject to the lien of the vendor for the price which is due to him. In selling the goods, therefore, for the payment of the price, he acts as the vendee’s agent, and ought to sell them to the best advantage, so as to obtain the best price he can. Sands, &c., v. Taylor, &c., supra. Generally he ought to sell them at auction, because, generally, they 'will sell to most advantage in that way. But he need not always sell them in that way, and it would be improper for him to do so if it happened that they would sell to greater advantage in some other way. Crooks v. Moore, 1 Sandford’s Superior Court R. 297, is an important case on this subject, and the reasons assigned by the court are very strong. The resale in that case was of iron, and it was a private one# made through a broker in metals. It was contended that it should have been made at auction. “As to this point,” the court said, “we are not aware that there is any rule of law which requires resales to be made at auction, and in no other mode. We believe the more sensible rule to be, that the seller must dispose of the goods in good faith, in the mode best calculated to produce their value. If the usual mode of selling the particular goods in the market where they are offered be at public auction, he ought, unquestionabl3, to dispose of them in that manner. If, however, large dealers in the article in question never send such goods to auction, and they will sell to more advantage through a broker, it is ^equally his duty to offer them in the market through a broker’s agency.” Id. 303. While it is the duty of the vendor to notify the vendee of his intention to resell the goods at the latter’s risk, it is not settled that he is bound to notify the vendee of the day and place of sale, even though it be at auction. There are certainly expressions to that effect in some of the recent cases. McEachron v. Randles, 34 Barb. R. 301. But they do not seem to be sustained by authority, and there are decisions the other way. In Gashell v. Morris, 7 Watts & Serg. R. 22, which was a case of a resale by a sheriff of property sold under execution, and an action brought by him to recover the loss upon the resale, one of the errors assigned - was, that the defendant below received no notice that a second sale of the property was to take place, nor of the time and place thereof. “But the records shows,” said the court, “that evidence was given to the court and jury, showing that he was required and notified by the sheriff, the plaintiff below, to pay the purchase money according to the terms of the sale, or otherwise the property would be resold at his risk. This notice, if any of the sort was requisite, was sufficient to put him on the lookout, so as to guard against the -consequences of a resale, which could only be done by his paying the purchase money without delay. It was certainly not the duty of the sheriff to notify the defendant below of the timé and place at which the resale would be made; it was sufficient, if not more than he was bound to do, to let the defendant know that unless he paid the purchase money after it became payable according to his undertaking, a resale would be made at his risk; and this, as appears by the evidence, was done. ’ ’
It is, of course, prudent and safe for the vendor to give notice to the vendee of the time and place of sale, if it is to be at auction, because the vendee will then have an opportunity of attending the sale and taking care of his own interest; *and if he neglect to do so, it will be his own fault. He will have less, if he can have any, cause to complain of a sacrifice at such resale, if it be fairly made, and he had due notice of the time and place of making it. But upon principle there can be no necessity for such notice to be given by the vendor, in order that he may maintain an action against the vendee for not complying with the terms of the original sale. He has a right to maintain such action for such non-compliance merely, and is at lea.st entitled to nominal damages. The quantum of damages which he really sustains and is entitled to recover, is the difference between the contract price of the goods and the price which they produced at the resale, supposing such resale to have been fairly made, or if not so made, then the price which they would have produced at such resale if it had been so made, after deducting from such price, in either case, all expenses incurred by the vendor in taking care of the goods and selling them. In none of the elementary books on the subject that I have seen, is it laid down that notice to the vendee of the time and place of sale is necessary. In some of the reported cases it appears that such notice was in fact given; and that, no doubt, is the usual, as it is the more prudent, course: In one of them, Crooks v. Moore, supra, such notice was given, but the sale was not *791 made till several days after the day named in the notice; and yet no objection was made by the vendee on that account, although the change was made without his consent or concurrence. No averment of such notice is made in the declaration in such cases. 4 Rob. Pr. 302. The vendor is not bound to sell the goods at all, but may do so or not at his election. He may, if he chooses, continue to hold them at the risk and as the goods of the vendee, and recover the price of them in an action for goods bargained and sold. If he elect to sell them, he is not bound to make such election immediately after the vend-ee’s default, *but may do so at any time while the default continues. He has a lien on the goods so long as they remain in his possession and the default continues, but he is not bound to enforce that lien. It is for his benefit and not that of the vendee, whose remedy is to perform the terms of sale and take possession of the goods. “He,” the vendor, savs Parsons, “may consider them as his own, if there has been no delivery; or he may consider them as the vendee’s, and sell them, with due precaution, to satisfy his lien on them for the price, and then he may sue and recover only for the unpaid balance of the price; or he may consider them as the property of the vendee, subject to his call or order, and then he recovers the whole of the price which the vendee should pay. As the action, in either case, proceeds upon the breach of the contract by the vendee, it seems reasonable that this election should be given to the vendor, and no part of it to the vendee. ’ ’ 3 Parsons on Contracts 209.
Now let us apply the foregoing principles, or such of them as may be applicable, to the case we have in hand.
The first question arises on the second instruction asked for by the defendants, and refused by the court, which asserts, that if notice was given to them that the goods would be sold on their account on the 16th of the month, and they were not sold on that day; but, without further notice to the defendants, were sold on the 18th of the month, then the plaintiffs are not entitled to recover.
If it be a true principle of law, as before stated, that no notice of the time and place of sale was necessary to maintain the action, then of course the instruction was properly refused. If it had been proved that the defendant sustained any injury from the change of the day, it'might have been material matter on the question of damages, and it might have been the duty of the court to instruct the jury to that effect, if such an instruction had *been asked for. And even in that case the plaintiffs would have been entitled to recover something. But no such proof was offered. The defendants seem to have given themselves no concern about the sale, and did not attend, so far as appears from the record, on the day and at the place of sale named in the notice, which was served upon them more than ten days before the day of sale. The plaintiffs, being thus left to judge for themselves and the defendants, adjourned the sale from the 16th to the 18th of the month, because the latter was the regular auction sale day of the auctioneers who made the sale, and the plaintiffs thought it would be better for all parties that the sale should be made on that day. No notice was given to the defendants of such postponement. The time was probably too short, as they lived in Richmond, and the sale was to be in Baltimore. And as they did not attend at the time and place named in the notice which was given, it may -well have been inferred that they did not desire notice of the postponement, and would disregard it if given. Notice of the sale on the latter, as well as the former, day was inserted in the Baltimore Sun. The goods were sold at auction fairly on the 18th, and brought as much, in the opinion of the witness of the plaintiffs, as they would have brought if they had been sold on the 16th. On that question, the defendants offered no testimony on the trial. There can be no doubt, I think, of the propriety of refusing to give the second instruction.
The next and only remaining question arises on the third instruction asked for by the defendants and refused by the court, that is: ‘ ‘If the plaintiffs delayed the resale of the goods for an unreasonable time, upon a falling market, and then sold them, they are not entitled to recover.”
The plaintiffs, as we have seen, had a right of election to sell these goods or not, and could elect to sell them at any time while they remained in their hands, and the '^default of the defendants continued. And this right was not at all affected by the fact that the goods, during all the time they remained in their hands, were falling in their market value. They still had a lien upon the goods which they could enforce or not, at their election. The defendants’ plain remedy, as before mentioned, was to comply with the terms of sale, and take away the goods. There could be no room, then, for saying that the plaintiffs delayed the re-sale for an unreasonable time upon a falling market, since they might elect to sell at any time and in any state of the market. The plaintiffs promptly, on the return of the goods by the defendants, gave them notice that they would hold the goods subject to their order, and would hold them to their contract. The plaintiffs continued so to hold the goods until the 5th of April, when they elected to sell them, and gave notice to the defendants to that effect. Their hope was that there would be no necessity for a sale, but that the defendants would pay the purchase money and take their goods. On the 15th of February the plaintiffs drew on the defendants at sight for the amount due, but the draft was returned protested. In the latter part of February, one of the defendants promised one of the plaintiffs to call at the store of the latter and settle their claim for the price of the cottons. Nothing *792 further having- been done by the defendants towards a settlement of the claim, the plaintiffs on the 5th of April elected to resell the goods, and look to the defendants for any deficiency arising from such re-sale; and accordingly, on that day, gave them the notice to that effect, which has been before mentioned. Certainly there was no unnecessary delay in making the sale after the plaintiffs elected to make it. Only eleven days’ notice was given of the sale, which was not unreasonably long, considering the residence of the respective parties, and especially considering the opportunity which was intended *to be afforded to the defendants to prevent the sale by paying the claim before the sale, which they were admonished by the notice to do, and thus avoid the consequences. But even if it could be said that the plaintiffs delayed the re-sale of the goods for an unreasonable time upon a falling market, and if there were any evidence in the case tending to show such unreasonable delay, still it could not properly be said that they were not entitled to recover. They would certainly be entitled to recover something, and would at least be entitled to recover the difference between the contract price of the goods and the price they would have produced on a re-sale properly made. So that, in any view, the court did not err in refusing to give the instruction.
It is . argued, however, that the court should not have refused to give the instructions, even if they were wrong in the form in which they were asked; but should have modified them, so as to make them right according to the court’s view of the law, and then given them. A court is bound to give any instruction asked for by either party,which correctly expounds the law upon any evidence before the jury. But if such instruction does not correctly expound the law, the court, as a general rule, may refuse to give it, and is not bound to modify it or give any other instruction in its place. This principle is founded on good reasons and is sustained by much authority. A party cannot, by asking for an erroneous instruction, devolve upon the court the duty of charging the jury on the law of the case. An instruction, as asked for, may be so equivocal, that to give or refuse it might mislead the jury; and thus it might have all the 'effect of an erroneous instruction. In such a case, it would be proper for the court to modify the instruction so as to make it plain. Baltimore & Ohio R. R. Co. v. Polly, Woods & Co., 14 Gratt. 448, 466. I do not think there is anything in *Peshine v. Shepperson, 17 Gratt. 472, (the only case cited on this subject by the learned counsel for the plaintiffs in error,) which is in conflict with this principle. On the contrary, the rule laid down in that case substantially accords with that laid down in the case in 14 Gratt. supra. See McDowell’s ex’or v. Crawford, 11 Gratt. 377, 402-406. But the evidence- in this case would not have warranted the court in giving any other instruction to the jury which could properly have led to a different result.
I am, therefore, for affirming-the judgment.
The other judges concurred in the opinion of Moncure, P.
Judgment affirmed.